UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NAACP - MILWAUKEE BRANCH,
SIERRA CLUB JOHN MUIR CHAPTER,
and MILWAUKEE INNER-CITY
CONGREGATIONS ALLIED FOR
HOPE (MICAH),

                Plaintiffs,                          Case No:

vs.

DAVE ROSS, in his official
capacity as Secretary of the Wisconsin
Department of Transportation;
WALTER C. WAIDELICH, JR. in his official capacity as
Acting Deputy Administrator of the Federal Highway
Administration; MICHAEL DAVIES, in his
official capacity as Division Administrator of
the Wisconsin Division Office of the FHWA;
FEDERAL HIGHWAY ADMINISTRATION;
ELAINE L. CHAO, in her official capacity as
Secretary of the U.S. Department of
Transportation; and U.S. DEPARTMENT OF
TRANSPORTATION,

                Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

## INTRODUCTION

1. This action challenges the final action of Defendants U.S. Department of Transportation

   (USDOT) and Federal Highway Administration (FHWA) approving a project of the

   Wisconsin Department of Transportation (WisDOT) to reconstruct and add travel lanes to a

   segment of the I-94 interstate highway from 16th to 70th streets in Milwaukee ("I-94"). The

   project, if it proceeds, will reconstruct, widen and add lanes and present and future capacity

   on I-94, using federal and state funds at an estimated cost of approximately $1 billion, while

1

failing and refusing to incorporate and implement any public transportation element, despite documented need for substantial expansion of public transit in order to meet the purposes of the project and to ensure equity and mitigation of adverse effects. The project will also have the likely effect of exacerbating regional racial segregation, and it will have adverse environmental effects on air quality and water resources. The refusal to address these issues occurred despite Defendants' knowledge of, among other issues, segregated land use patterns and the need for transit to address environmental concerns and to comply with civil rights requirements. If the project proceeds as approved, it will have major and significant impacts on the most racially segregated region in the United States. FHWA's final action approving the expressway project is unlawful because the action was based on a Final Environmental Impact Statement (FEIS) that Defendants prepared and approved without full and adequate consideration of all reasonable alternatives or of a wide range of project impacts, including social, racial, economic, land use, environmental, employment, indirect and cumulative impacts.

2. Plaintiffs seek a declaration that the federal Defendants and Defendant Ross have violated the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA), by failing to prepare an adequate FEIS; an order vacating and remanding the FEIS, Record of Decision (ROD), and Notice of Final Federal Agency Actions pertaining to the Zoo Interchange project for the purposes of reconsidering and curing the violations; and preliminary and permanent injunctions to prohibit all construction and construction-related activities and expenditures related to the expressway project until an adequate FEIS has been prepared and relevant impacts adequately considered and resolved.

2

JURISDICTION AND VENUE

3. This action arises under NEPA, 42 U.S.C. § 4321 *et seq.* and the APA, 5 U.S.C. § 551 *et seq.* This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1361.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the project is in this district and a substantial portion of the events or omissions giving rise to the claim occurred in the district.

5. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court may issue a declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201-02.

PARTIES

6. Plaintiff NAACP- Milwaukee Branch ("NAACP" or "the Branch") was launched in 1924 and is one of the oldest NAACP branches in the nation. Its mission is, among other things, "to ensure the political, educational, social, and economic equality of all citizens" and "to inform the public of the adverse effects of racial discrimination and to seek its elimination." Its principal place of business is 2745 N. Dr. Martin Luther King Jr. Dr. #202, Milwaukee, WI 53212. Among the "core initiatives" that the Branch has committed to addressing is to "support an alternative to widening I-94 by Miller Parkway that includes resurfacing the current highway and increasing alternative intermodal transportation to job hubs in Washington, Ozaukee, and Waukesha counties." It has used and diverted its resources to organize, advocate and educate for improved public transportation. It has also submitted testimony on these issues, including comments on the I-94 Draft Environmental Impact Statement (DEIS) and Final Environmental Impact Statement (FEIS) itself.

7. The Branch's members are predominantly African-American. Its office is in a predominantly

3

African-American neighborhood and many of its members live in predominantly minority neighborhoods in Milwaukee. Many members of the Branch are also transit-dependent and unemployed or underemployed, and would use transit to access employment and other activities and services, were it to be made available, and who also may suffer greater adverse health effects from the higher vehicle air emissions expected from the project as approved, than if a reasonable alternative with less highway expansion and more transit is constructed. The interests of members of the Branch fall within the zone of interests protected by the laws sought to be enforced in this action.

8. For example, Eve Smith is an African-American resident of Milwaukee and a member of the NAACP-Milwaukee Branch Executive Board. Although she has a driver's license, she has not owned a car for several years. When she was working, Ms. Smith used public transit to get to her place of employment, and she still uses it for a multitude of daily activities, including to go to school, doctor's appointments, grocery shopping, and visiting friends– and to get to Executive Board meetings of the Branch.

9. Plaintiff Milwaukee Inner-city Congregations Allied for Hope (MICAH) is a multi-racial, interfaith organization committed to addressing justice issues that have an impact on the community and on the members of MICAH's three dozen member congregations. Its principal place of business is 1927 N. 4th St., Milwaukee, WI 53212. Among the justice issues that MICAH has long worked to address is jobs for unemployed and underemployed urban members, and the associated need for public transportation to access jobs that do exist. It has used and diverted its resources, through its Jobs and Economic Development Committee and Transportation Work Group, to organize, advocate and educate for improved public transportation. It has also submitted oral and written testimony on these issues,

4

including comments on the I-94 DEIS and FEIS.

10. Most MICAH congregations are in Milwaukee, and most of MICAH's members live in Milwaukee. MICAH's office is in a predominantly minority neighborhood, many MICAH congregations are located in predominantly minority neighborhoods, and many members are African-American and Latino. Many MICAH members are also transit-dependent and unemployed or underemployed, and would use transit to access employment and other activities and services, were it to be made available, and who also may suffer greater adverse health effects from the higher vehicle air emissions expected from the project as approved, than if a reasonable alternative with less highway expansion and more transit is constructed. The interests of MICAH members fall within the zone of interests protected by the laws sought to be enforced in this action.

11. Plaintiff Sierra Club John Muir Chapter ("John Muir Chapter") is the Wisconsin unit of the Sierra Club, which was founded in 1892 and is now the nation's largest and most influential grassroots environmental organization, with more than two million members and supporters. The Sierra Club's mission is to explore enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives. The John Muir Chapter has over 15,000 members in Wisconsin, 6,000 members in Southeastern Wisconsin, and 3,000 members in Milwaukee County, and has its principal place of business at 754 Williamson Street, Madison, WI 53703.

12. Members of the John Muir Chapter include individuals who are dependent on public transit in Milwaukee County, as well as individuals who would prefer to use public transit, but are

5

instead dependent on using automobiles for some or all of their travel within the region because of inadequacies in the public transit system. Chapter members in the Milwaukee area include African-Americans and Latinos. The Chapter has used and diverted its resources, to organize, advocate and educate for improved public transportation. It has also submitted oral and written testimony on these issues, including comments on the I-94 DEIS and FEIS. The Chapter also has members who may suffer greater adverse health effects from the higher vehicle air emissions expected from the project as approved, than if a reasonable alternative with less highway expansion and more transit is constructed. The interests of Chapter members fall within the zone of interests protected by the laws sought to be enforced in this action.

13. Defendant Dave Ross is the Secretary of the Wisconsin Department of Transportation. His principal place of business is the Hill Farms State Office Building, 4802 Sheboygan Avenue, Madison, WI 53705. He is sued in his official capacity only.

14. The Wisconsin Department of Transportation ("WisDOT") is the agency within the State of Wisconsin primarily responsible for highway planning, funding and construction. Its primary administrative office is the Hill Farms State Office Building, 4802 Sheboygan Avenue, Madison, WI 53705.

15. In conjunction with FHWA, WisDOT prepared, reviewed and approved the FEIS for the project and also held hearings as part of the process of preparing the FEIS.

16. References to the "state defendant" are to Defendant Ross.

17. Defendant Walter C. Waedelich, Jr.is the Acting Deputy Administrator of the Federal Highway Administration (FHWA), an agency of the U.S. Department of Transportation. He is sued in his official capacity only.

6

18. Defendant Michael Davies is the Division Administrator of the FHWA Wisconsin Division Office, which is located at 525 Junction Road, Suite 8000, Madison, Wisconsin 53717. He is sued in his official capacity only.

19. Defendant FHWA is the agency within USDOT primarily responsible for highway planning and funding. FHWA, through its Wisconsin Division, was responsible with WisDOT for preparing, reviewing and approving the EIS in accordance with NEPA.

20. Defendants Waedelich, Davies and FHWA are referred to collectively as "FHWA."

21. Defendant Elaine L. Chao is Secretary of the U.S. Department of Transportation (USDOT). She is sued in her official capacity only.

22. Defendant USDOT is the executive department of the federal government responsible for approval of highway projects.

23. Defendants USDOT and Chao are referred to collectively as "USDOT."

24. References to the "federal Defendants" are to the FHWA and USDOT Defendants.

FACTUAL BACKGROUND

Facts Relating to Segregation and Isolation of Minority Communities

25. The relevant portion of I-94 runs east-west through Milwaukee County, and primarily through the city of Milwaukee. At 124th St., approximately 3 ½ miles west of the study area, I-94 enters Waukesha County after passing through the Zoo Interchange.

26. Persons of color, predominantly African-Americans and Latinos, constitute 57.1% of the study area population for the I-94 East-West project.

27. The metropolitan statistical area (MSA) in which the project is located, as defined by the federal government, includes Milwaukee, Waukesha, Ozaukee and Washington counties, all of which are adjacent to Milwaukee County.

28. In 1990, 2000, and 2010, the Milwaukee MSA was, overall, the most racially segregated region in the United States for African Americans. The segregation is due in no small part to the fact that while in 2010 Milwaukee County had an African American population of about 26% and a total minority population of about 46%, the suburban counties' populations - including Waukesha County - are each only about 1% African American and more than 90% white non-Hispanic. There is also significant segregation of Latinos in the MSA. Defendants are or should be aware of these disparities.

29. The Southeastern Wisconsin Regional Planning Commission (SEWRPC) is the legally designated metropolitan planning organization (MPO) for southeastern Wisconsin. For SEWRPC purposes, the "region" includes Milwaukee, Waukesha, Washington and Ozaukee counties, and also includes Kenosha, Racine and Walworth counties, all of which are also significantly less diverse than Milwaukee County.

30. Defendants routinely rely on planning materials prepared by SEWRPC to support their plans and projects, including the I-94 project.

31. There are significant racial disparities in transit dependence in the MSA and region, with persons of color being far less likely than whites to have valid driver's licenses, and far more likely than whites to live in "zero vehicle" households. For example, "[o]nly about 75 percent of Milwaukee County Black/African American households indicated they have an automobile available for travel, and only an estimated 60 percent of Black/African American adults have a driver's license. Only about 85 percent of Milwaukee County Hispanic households indicate they have an automobile available for travel, and only an estimated 50 percent of Hispanic adults have a driver's license. In comparison, about 90 percent of nonminority households indicate that they have an automobile available for travel, and an

estimated 80 percent of nonminority adults have a driver's license." SEWRPC, "2050 Regional Land Use and Transportation Plan ("Vision 2050") (July 2016), App. N at N-6. Moreover, this data likely understates the disparities because a disproportionate number of persons of color who have driver's licenses have had those licenses suspended. In Waukesha County as well, persons of color are far more likely than whites to live in zero-vehicle households. As Vision 2050 also made clear, in both Milwaukee and Waukesha Counties, the percentage of transit users who are African-American exceeds their percentage of the population. Vol. 1, Ch. 5 at 297. Defendants are or should be aware of these disparities.

32. Persons with disabilities in the region are also disproportionately likely to depend upon public transportation. Defendants are or should be aware of these disparities.

33. Persons of color in the MSA and region have significantly higher unemployment and joblessness rates than non-Hispanic white persons. Defendants are or should be aware of these disparities.

34. Although there are many jobs and significant job growth in suburbs outside Milwaukee, including in Waukesha County, there is little transit service from Milwaukee County to Waukesha County or other suburban counties outside of Milwaukee County. Further, most of the minimal inter-county transit service that exists is structured for Waukesha County residents to commute to jobs in a few portions of Milwaukee, especially downtown, rather than for Milwaukee residents to access jobs in Waukesha County.

35. Although the settlement of *MICAH v. Gottlieb*, a prior lawsuit relating to Defendants' failure to include transit in a highway expansion project, has resulted in two to three bus routes connecting the central city to the suburbs, Defendants' funding for those routes under the settlement will terminate prior to the time I-94 East-West construction is expected to begin.

9

36. Many persons, including a disproportionate number of persons of color and persons with disabilities, depend upon transit to access non-employment services and facilities, including health care, education, shopping, and recreation.

37. The purpose of the I-94 project is not only to address the circumstances of those living or working adjacent to the Project, but to resolve regional transportation needs. Public transportation is also required to address regional transportation needs and in fact is desired by a larger share of the region's population than is highway expansion.

38. In the year 2000, to settle a race discrimination complaint based on, *inter alia*, its alleged disparate treatment of funding for and development of highway and transit projects in the Milwaukee area, WisDOT agreed that "[t]he Wisconsin Department of Transportation shall continue to use its best efforts to expand and improve transit service within the Milwaukee Metropolitan Area to enable transit dependent residents of Milwaukee to better access areas of job growth." (Settlement Agreement in *Wallace v. Thompson*, No. 99-020 and *Campaign for a Sustainable Milwaukee et al. v. Thompson*, No. 99-029 (US DOT - OCR, Nov. 17, 2000)). The settlement was made under the auspices of defendant USDOT.

39. WisDOT and Defendant Ross and his predecessors failed to follow, and the federal Defendants failed to enforce, that provision of the 2000 settlement agreement.

40. Instead, subsequent to the settlement agreement, budget cuts and restrictions have forced the decline of transit service within the Milwaukee metropolitan area.

41. SEWRPC's Regional Transportation System Plan for 2035 ("2035 Plan") was in effect during the entire time when the DEIS and FEIS were developed.

42. The 2035 Plan explicitly stated that transit expansion was necessary to ensure that persons of color benefited from regional transportation system investments. The 2035 Plan also stated

explicitly that transit improvements were to be given "equal priority" with other improvements and that even during economic downturns it is necessary that "progress in plan implementation, *particularly with respect to public transit*, continues, and is not eroded through service reductions." *Id*. at 366; emphasis added. SEWRPC also recommended that, beginning in 2005, there be annual increases in transit service and vehicle miles served by transit. *See, e.g., id*. at 372, 407.

43. The reality, however, is that both before and since the 2035 Plan was adopted there was *both* an erosion of transit service and increases in bus fares. "Since 2001, transit service has decreased each year, due to continued reductions in Federal funding and State and local budget constraints." VISION 2050, Vol 1, Ch 4, p. 216. While Wisconsin reduced its percentage share of operating assistance for the transit system during these years, WisDOT's funding for and construction of major highway projects, including projects in southeastern Wisconsin, increased substantially.

44. The 2035 plan, at 349, also clearly contemplated that offsetting and enhancing benefits, in the form of improved transit, would be provided for minority communities:

> The recommendations of the regional transportation system plan with respect to public transit, in particular, provide improved accessibility for the central urban areas of the Region where many residents are of minority population and/or low income and do not have access to an automobile. The proposed rapid and express transit system improvements may be expected to more fully integrate minority areas into the regional economic and social structures by, for example, increasing the number of central urban residents that may be able to access employment opportunities and other activities in a timely manner. The planned transit improvements are intended to help reduce overall travel times, improve travel convenience, and improve access to employment and activity centers.

45. During the planning process for SEWRPC's next regional transportation plan, "Vision 2050," it became absolutely clear that a substantial increase in public transportation was widely desired in the region – far more desired than highway improvement or expansion. For

example, a random telephone survey of residents of SEWRPC counties, conducted in 2013 for the Vision 2050 process, found that 63% of respondents wanted to "improve/expand" public transportation in the region, while only 48% wanted to "improve/expand" state and interstate highways.

46. SEWRPC's Vision 2050 plan also made clear that transit expansion was a critical, equitable, outcome for persons of color and persons with disabilities, and that it provided offsetting benefits to those communities. "Comparing the accessibility provided to employment and major activity centers under the Preliminary Plan to those of the Trend and existing conditions indicates that the Preliminary Plan significantly improves accessibility provided by transit, and *many of the investments in transit are targeted in areas that would result in the minority, lower income populations, and people with disabilities of the Region benefiting from these improvements…* [T]he substantial increases in transit service under the Preliminary Plan would provide access for more people to existing retail centers, major parks, public technical colleges/universities, health care facilities, grocery stores, [Milwaukee Regional Medical Center], and [General Mitchell International Airport]... The significant expansion under the Preliminary Plan would greatly improve access to existing minority and lower income populations and people with disabilities to the activity centers analyzed, with the Preliminary Plan generally serving 10 to 30 percent more minority and low-income populations than the Trend…" "Vision 2050 – Preliminary Draft App. H – Complete Results of the Preliminary Recommended Plan Evaluation," Criterion 2.1.1: Level of accessibility to jobs and activity centers for minority and low-income populations by mode (emphasis added). Upon information and belief, the final version, which has not yet been posted on SEWRPC's website as of the morning of March 1, 2017, will include essentially the same

12

information.

47. Portions of the Milwaukee-Racine region, which includes Milwaukee, Ozaukee, Racine, Washington, Waukesha, and Kenosha counties, has long been out of compliance with federal air quality standards. It has been a nonattainment area for PM 2.5, and a "moderate" nonattainment area for ozone. While US EPA issued an attainment designation for ozone for Milwaukee County as of August 1, 2012, there were 5 nonattainment days in Milwaukee County in 2016 – as many as in the two prior years combined, and more than double the number from 2011, the year before the "attainment" designation was issued. (*See* Wisconsin Air Quality Notice History –

   http://dnr.wi.gov/topic/AirQuality/AQNSHistoryList.asp?county=)

48. Transit is an integral and stated method for Wisconsin to comply with Clean Air Act requirements, one which, as discussed above, is not being adequately provided.

49. Public transit also contributes to efficiency in the transportation system, including reduced air pollution and energy consumption." *2035 Plan* at 366.

50. In comments submitted to Defendants on the DEIS and FEIS for this project, and with which Plaintiffs concurred, health experts made clear that there are adverse health effects on persons living near the expanded freeway, who, as noted above, are disproportionately persons of color, and who have less access to health care than white persons. For example, persons of color in the region, especially African Americans, have higher rates of air-quality-related respiratory disease, such as asthma, than white persons. Traffic-related air emissions resulting from the expansion of this freeway would likely contribute to an increase in asthma attacks to adults and children in the adjacent neighborhoods. Increased air pollution would also be a significant contributor to increased heart disease incidence, premature death and

adverse birth outcomes that have life-long impacts.

51. Conversely, increasing public transit would have beneficial health effects, as health experts also made clear in their comments on this project to Defendants, and with which Plaintiffs concurred. Public transit is a more active form of movement—*i.e.*, encouraging walking even short distances to and from transit stops that has a cumulative beneficial impact on physical activity and health, and at the same time, decreases air pollution, which benefits a wide segment of the population.

52. The region's segregation is rooted in a long history of discriminatory governmental policies and actions – ones that have continued into the present century, and were exacerbated by the political climate in many of Milwaukee's suburbs. While overtly racist policies are now illegal, their legacy persists.

53. In metropolitan Milwaukee, freeway construction both destroyed neighborhoods – many populated by communities of color - and facilitated urban sprawl, which was overlaid with, and related to, racial segregation in housing. Racially disparate forms of residential relocations caused by freeway construction compounded the problem, while sprawl quite literally paved the way for white flight from the city.

54. "White flight" to the suburbs continues to perpetuate segregation. For example, as of 2010, Waukesha County had 19% of the region's total population, but only 6% of its minority population. From 2000 to 2010, Milwaukee County had a 12% decline in its non-Hispanic white population at the same time its minority population was increasing by 21%. SEWRPC Technical Report No. 11, "The Population of Southeastern Wisconsin," (2013) at 19-20.

55. A map SEWRPC created based on 2010 census data confirms not only the region's segregation, but also that the proposed project will cut directly through the region's black and

14

Latino communities (the area between the overwhelmingly black north side and the overwhelmingly Latino south side). A true and correct copy of that map is included here:



Map 84

POPULATION BY
RACE AND ETHNICITY
IN THE SOUTHEASTERN
WISCONSIN REGION: 2010

1 DOT REPRESENTS 25 PEOPLE
● WHITE ALONE, NOT HISPANIC
● BLACK ALONE, NOT HISPANIC
● ASIAN ALONE, NOT HISPANIC
● SOME OTHER RACE ALONE, OR
   TWO OR MORE RACES NOT HISPANIC
● HISPANIC
— CIVIL DIVISION BOUNDARY: 2010

NOTE: MINORITY CONCENTRATIONS
IN THE CITY OF FRANKLIN IN
MILWAUKEE COUNTY, THE
VILLAGE OF STURTEVANT
AND TOWN OF DOVER IN
RACINE COUNTY, AND THE
TOWN OF DELAFIELD IN
WAUKESHA COUNTY ARE
ATTRIBUTABLE TO
CORRECTIONAL
INSTITUTIONS IN THOSE
LOCATIONS.

Source: U.S. Bureau of the Census and SEWRPC.

378

15

56. The project's capacity expansion elements alone, and especially those elements when combined with other recent and planned highway capacity expansion projects in the region, will contribute to and exacerbate this suburban sprawl.

57. That sprawl will also perpetuate or exacerbate racial segregation.

58. Defendants failed to adequately evaluate, avoid or seek to mitigate the adverse cumulative effects, including social, economic and racial effects, of that capacity expansion, especially on segregated communities of color.

59. Federal Defendants have required, for nearly three decades, evaluation of the effects of a project on communities of color and persons with disabilities as "social" effects. "Guidance for Preparing and Processing Environmental and Section 4(F) Documents*," FHWA Technical Advisory T 6640.8A* (Oct. 30, 1987) at Sec. V.G.3.e. Title VI of the Civil Rights Act and its implementing regulations also prohibit recipients of federal funds, including state agencies such as WisDOT, from taking actions that have the intent or effect of discriminating on the grounds of race, color, or national origin. 42 U.S.C. § 2000d; 49 C.F.R. § 21.5. Federal civil rights regulations, 23 C.F.R. § 200.9(a)(11), also require state highway agencies, such as WisDOT, to "annually submit an updated Title VI implementing plan to the Regional Federal Highway Administrator for approval or disapproval." From 2005 to late 2011 WisDOT did not have, and thus did not submit, any Title VI implementing plan. The FHWA Defendants were aware of the lack of the plan and permitted WisDOT and defendant Ross' predecessors to ignore this requirement.

60. In April 2011, a request for investigation of the lack of a Title VI plan was filed. In December 2011, while the complaint investigation was still in process, staff in the FHWA project development unit known as "HEPE" explicitly expressed concern that the anticipated

16

finding of civil rights non-compliance by WisDOT would adversely affect WisDOT projects and lead to others challenging highway projects on civil rights grounds. It explicitly stated that "it may become necessary for HEPE to add some pressure to the Civil Rights office." Upon information and belief, there were deliberate efforts made by FHWA, USDOT and/or WisDOT staff members or officials to apply such pressure and limit the outcome of the civil rights investigation and its effect on highway project development and construction in Wisconsin.

61. On or about July 25, 2012, civil rights officials at FHWA headquarters in Washington DC found WisDOT "deficient" in its civil rights compliance for, *inter alia*, the failure to have an appropriate Title VI plan.

62. FHWA's July 2012 report also outlined specific deficiencies, including WisDOT's failure to address Title VI in its "Facilities Development Manual" (FDM), which is used to guide development of projects such as this one. WisDOT was instructed that, among other changes, it needed to address "[h]ow Title VI/Nondiscrimination impacts [are] identified and analyzed under" the FDM socioeconomic impacts chapter. Yet as of April 2016 – after the DEIS and FEIS were issued - WisDOT had failed to update the FDM socioeconomic factors chapter since the 1990s, and much of it had not been updated since the 1980s.

63. The I-94 project as approved also would significantly increase the amount of impermeable pavement surface and the amount of roadway surface to which road salt is applied in winter, thereby also increasing the amount of runoff, and the amount of chloride pollution, into adjacent and downstream communities and bodies of water, as well as placing additional loads on local and regional sewer systems, and increasing the likelihood of flooding and basement backups.

17

Facts Relating to Environmental Impact Statement Process

64. The I-94 project is a southeastern Wisconsin "freeway megaproject," for which the WisDOT "may" provide funding under Wis. Stat. § 84.0145(3)(b).

65. NEPA requires agencies to "utilize a systematic, interdisciplinary approach which will insure the integrated use of natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment." 42 U.S.C. § 4332(A). Because FHWA and WisDOT determined that the I-94 project is a major federal action significantly affecting the quality of the human environment, they undertook the preparation of an EIS.

66. FWHA and WisDOT, working closely in conjunction with each other, prepared a Draft EIS (DEIS) for the project, which was signed on November 4, 2014.

67. FHWA and WisDOT, working closely in conjunction with each other, prepared the FEIS, which was signed on January 29, 2016.

68. The FEIS includes a capacity expansion to 8 travel lanes in the entire project area. Multiple cemeteries are adjacent to a significant portion of the project, including Calvary Cemetery, a Catholic cemetery; Spring Hill Cemetery, a Jewish cemetery; and Wood National Cemetery, a veterans' cemetery. Defendants cannot widen the pavement in the portion of the project from Zablocki Drive to Hawley Road because this would disturb the graves. In this segment, the increase in capacity therefore will be accomplished by making the travel lanes narrower than established safety standards.

69. The FEIS claims that part of the project purpose and a significant reason for the capacity expansion is to increase safety. However, decisions made about the project, such as using 11foot wide highway lanes and shoulders as narrow as 2 feet, rather than the standard 12 foot

18

lanes and full shoulders which could be accommodated if travel lanes were not added, actually increase the likelihood of vehicle accidents. For this reason and others, the Project's capacity expansion will not achieve its stated safety improvement purpose.

70. The FEIS also claims that part of the project purpose is congestion reduction. The agencies' "preferred alternative" that was approved in the ROD will be unable to achieve its purpose and goal of being able to maintain a Level of Service of "D" unless transit usage in the region is at least doubled, as Defendants' own records make clear. However, unless the needed transit expansion facilities are included and implemented as part of highway expansion projects such as this one, such an increase in transit in the region will not occur. Without the expansion of transit facilities contemplated in the 2035 and Vision 2050 plans, transit will instead continue to decline, and the billion dollar expenditure on the Project's capacity expansion will not achieve its stated congestion reduction purpose. Plaintiffs and others repeatedly requested that Defendants consider a "reasonable alternative" that incorporated implementation and funding of substantial expansion and improvement of public transit as an integral part of the project. Defendants refused to consider that "reasonable alternative." In short, implementation of the project as approved, without implementing substantial transit expansion as a part of the project, will not achieve the project's stated purpose, and Defendants are aware of this. The inability of the project as approved to achieve its stated congestion reduction goals also renders Defendants' analysis of the project's expected safety improvements erroneous and arbitrary.

71. In declining to incorporate and implement public transit as part of the project, Defendants stated that SEWRPC had found that I-94 capacity expansion was necessary whether or not transit was expanded. Although Defendants adopted, without meaningful separate analysis,

SEWRPC's conclusions regarding the need for the I-94 expansion project, they refused to accept or comply with SEWRPC's transit recommendations. As a result, Defendants did not meaningfully evaluate, or incorporate at all, transit capacity preservation and expansion alternatives that are also necessary for regional transportation system development, and did not evaluate or address SEWRPC's determinations that highway and transit development both need to proceed at the same rate for reasons including environmental justice and civil rights compliance. Nor did Defendants evaluate or require the evaluation of indirect and cumulative impacts – including adverse social, economic, civil rights, environmental justice, health and air quality impacts – of *failing* to provide the recommended transit preservation and capacity increases.

72. Defendants asserted that there were funding barriers to transit expansion, but did not address the existing funding barriers to highway expansion, including large past and current shortfalls in the state's highway fund, projections of shortfalls into the future, and repeated delays and deferments in proceeding with already-approved major highway projects within the state as well as anticipated delays in this project itself. The FEIS for the project stated that funding for final design activities would be obtained prior to the signing of the project's ROD. However, the ROD was issued without such funding being obtained, and it has not been obtained to date.

73. The failure to include actual transit expansion as part of the "reasonable alternative" also has adverse, cumulative, social, economic and health effects, including significant racially disparate adverse effects on communities of color and on persons with disabilities. Had the agencies considered this alternative, they would also have had to "rigorously explore and objectively evaluate" that alternative and its effects, including the relative effects for persons

20

of color. There is little doubt that such an analysis would have shown that a transit-increase alternative would have had more positive effects and more mitigating effects, and fewer adverse effects, on persons of color – who, again, comprise a majority of the population of the study area - than the selected proposal. Nevertheless, Defendants declined to consider a combined alternative of highway reconstruction and actual implementation of substantial transit expansion as a reasonable alternative.

74. During the EIS process, organizations, including Plaintiffs, provided Defendants with data about segregation and disparate transit dependence in the region, and the need for transit preservation, improvement and expansion to address those deficits.

75. During the EIS process, organizations, including Plaintiffs, requested that Defendants address anticipated direct, indirect and cumulative adverse effects, including the racially disproportionate adverse effects of failing to incorporate and implement transit expansion; the potential land use and associated social effects, including segregation effects, of facilitating automobile access to non-diverse suburban communities; adverse health and air quality effects; and potential flooding and water quality effects, including potential flooding in disproportionately minority Milwaukee neighborhoods and potential effects related to the combined effects of increased impermeable pavement and increased use of road salt .

76. Defendants failed to meaningfully (or at all) evaluate many indirect and cumulative effects of the project, especially as those affect communities of color.   Instead, the FEIS repeatedly subsumes issues of race under income, stating these are problems of, for example, "low income people" or "low skilled workers," rather than addressing the well-documented, specific effects on communities of color.

77. During the EIS process, despite numerous requests from Plaintiffs and others to mitigate

these long term cumulative adverse impacts, not just short-term construction-related effects,

Defendants declined to alter the project to mitigate these concerns.

78. On September 9, 2016, FHWA issued its Record of Decision (ROD) on the project.

79. On October 7, 2016, FHWA's "Notice of Final Federal Agency Actions on Proposed

Highway in Wisconsin" (Notice) was published in the *Federal Register*, at 81 FR 69898. The

notice announced final FHWA action granting approval of the I-94 project, and referred to

the FEIS, the ROD, and other documents in the administrative record for a description of the

agency's actions on the project. The notice also stated that the approval applied to "all laws

under which such actions were taken, including but not limited to" the Civil Rights Act of

1964, 42 U.S.C. § 2000(d) et.seq., and the Americans with Disabilities Act, 42 U.S.C. §

12101.

80. The project cost is estimated to be over $1 billion. The project receives and will receive

hundreds of millions of dollars in federal financial assistance.

## STATUTORY AND REGULATORY FRAMEWORK

81. The Federal Aid Highway Act (FAHA), 23 U.S.C. § 109(h), mandates that any "possible

adverse economic, social, and environmental effects relating to any proposed project on any

Federal-aid system have been fully considered in developing such project, and that the final

decisions on the project are made in the best overall public interest, taking into consideration

the need for fast, safe and efficient transportation, public services, and the costs of

eliminating or minimizing such adverse effects and . . . (1) air, noise, and water pollution; (2)

destruction or disruption of man-made and natural resources, . . . community cohesion and

the availability of public facilities and services; (3) adverse employment effects, and . . . (5)

disruption of desirable community and regional growth."

82. FAHA also mandates that highway projects be consistent with plans for implementation or

maintenance of air quality standards. 23 U.S.C. § 109(j).

83. FAHA also requires that the statewide transportation planning process "emphasize the *preservation* of the existing transportation system." 23 U.S.C. § 135(d)(1)(h) (emphasis added).

84. NEPA requires federal government agencies, and, as here, state agencies acting with the guidance and participation of the responsible federal officials, to prepare an EIS on all major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332.

85. NEPA requires federal agencies to "utilize a systematic, interdisciplinary approach which will insure the integrated use of natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment." 42 U.S.C. § 4332(A); 40 C.F.R. § 1502.6. Regulations promulgated by the Council on Environmental Quality (CEQ) to govern the criteria and procedures to be applied by federal agencies when they review proposed projects under NEPA require agencies to "insure the professional integrity, including scientific integrity, of the discussion and analyses in environmental impact statements." 40 C.F.R. § 1502.24. Accordingly, agencies may not selectively ignore consequences or use discredited science.

86. An EIS must meaningfully evaluate alternatives to a proposed action, 42 U.S.C. § 4332(C)(iii), and must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). An EIS must "rigorously explore and objectively evaluate all reasonable alternatives" and . . . [d]evote substantial treatment to each alternative considered in detail . . . so that reviewers may

evaluate their comparable merits." 40 C.F.R. § 1502.14(a). This analysis will be irreparably skewed by a failure to adequately consider either reasonable alternatives or the consequences of the proposed action. The EIS must include the alternative of no action, must include reasonable alternatives not within the lead agency's jurisdiction, and must include appropriate mitigation measures not already included in the proposed action or alternatives. 40 C.F.R. §§ 1502.14(c), (d), (f).

87. An EIS must evaluate the effects of the proposed project. "Effects and impacts as used in these regulations are synonymous. Effects includes ecological . . ., aesthetic, historic, cultural, economic, social, or health [effects], whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

88. An EIS must take a "hard look" at indirect effects and their significance. 40 C.F.R. §§ 1508.8(b), 1502.16(b). Indirect effects as those that are "caused by the action and are later in time or farther removed in distance [than direct effects], but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Indirect effects "include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id*. In evaluating issues such as land use and growth patterns, an agency "cannot simply assume that development will occur at the same pace whether or not Defendants yield to the demand for more roads." *Highway J Citizens Group v. USDOT*, 656 F.Supp.2d 868, 887 (ED WI 2009).

89. An EIS must evaluate "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local . . . land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16(c). "Where an inconsistency exists, the statement should

describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 C.F.R. § 1506.2(d).

90. An EIS must evaluate "[u]rban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures." 40 C.F.R. § 1502.16(g).

91. An EIS must take a hard look at cumulative impacts. 40 C.F.R. § 1508.25. A "cumulative impact" is:

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. The goal is to highlight negative impacts or effects that might occur if the minor effects of multiple actions accumulate over time. An agency – including these specific agencies, who were instructed as such nearly four years ago - cannot simply state that development will occur with or without the project, but instead must actually analyze the possible growth-inducing effects of a proposed highway project. *See, MICAH v. Gottlieb,* 944 F.Supp.2d 656, 671-673 (W.D. WI 2013).

92. An EIS must "[i]nclude appropriate mitigation measures not already included in the proposed action or alternatives" 40 C.F.R. § 1502.14(f) and "[m]eans to mitigate adverse environmental impacts." 40 C.F.R. § 1502.16(f).

93. "Mitigation includes:

> (a) Avoiding the impact altogether by not taking a certain action or parts of an action.

> (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

25

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments."

40 C.F.R. § 1508.20. Thus, mitigation is not limited to mitigation of traffic congestion.

94. Mitigation can include "incorporating some form of transit into the project." *MICAH v. Gottlieb,* 944 F.Supp.2d at 670.

95. The APA, 5 U.S.C. § 551 *et seq.*, requires that federal agency actions and decisions follow all statutorily prescribed procedures and comply with all applicable laws. The APA also requires that a reviewing court hold unlawful and set aside any agency action if it fails to meet statutory, procedural or constitutional requirements or if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706.

96. The APA authorizes federal courts to enjoin agency activity if it fails to meet statutory, procedural or constitutional requirements or if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

97. The federal and non-federal participation in this project, including but not limited to federal financial assistance for the project, is sufficiently interrelated to constitute a major federal action for NEPA purposes.

98. For the reasons set forth below, the federal Defendants and Defendant Ross have violated NEPA and the APA by approving the I-94 expansion project and deciding to proceed with the project. Unless they are enjoined from proceeding with the project until after they have fully complied with the requirements of NEPA and the APA, their violation of federal law will continue.

26

<u>FIRST CAUSE OF ACTION: VIOLATION OF NEPA</u>
<u>(Inadequate Analysis of Alternatives)</u>

99. Plaintiffs reallege and incorporate paragraphs 1 through 98 above.

100.    The FEIS and ROD prepared, reviewed and approved by WisDOT and Defendant Ross,
    in conjunction with the federal Defendants, violated NEPA by failing to consider adequately
    all reasonable alternatives, including but not limited to incorporating and implementing
    substantial expansion of public transportation as part of the alternative whether or not the
    project included adding highway traffic lanes.

101.    By using an incomplete analysis of the environmental impacts of the project and by
    underestimating the potential benefits of alternatives, and ignoring the potential benefits of
    alternatives which were not given full consideration, Defendants seriously and unjustifiably
    skewed the analysis of alternatives. Defendants weighed alternatives to the proposed project
    against an unrealistically optimistic assessment of project benefits and shortcomings.

102.    For the foregoing reasons, the FEIS fails to fulfill the purposes of NEPA and
    Defendants' decision to approve and proceed with the project based on that flawed FEIS is
    arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

<u>SECOND CAUSE OF ACTION: VIOLATION OF NEPA (Inadequate Analysis of Effects)</u>

103.    Plaintiffs reallege and incorporate paragraphs 1 through 98 above.

104.    The FEIS and ROD prepared, reviewed and approved by WisDOT, Defendant Ross, and
    the federal Defendants violates NEPA by failing to adequately identify, disclose, and study
    the effects and impacts of the I-94 project on the natural and human environments in the
    region, including but not limited to:

    a.  The social, economic, employment, urban and racial effects, including cumulative
        effects, of failing to preserve, improve and expand transit, and of the disparate
        treatment of highway and transit development in the region, especially in light of the

27

known racial disparities and the documented need for transit to develop at the same rate as highways to achieve civil rights compliance and meet transportation and environmental needs of the community;

b. The land use, and associated social, cultural and racial effects, including but not limited to impacts related to facilitation of suburban and exurban growth patterns ("sprawl") and those effects insofar as they facilitate or perpetuate racially segregated residential land use patterns, the relocation of jobs and businesses from older, developed urban areas with significant minority populations to less developed, predominantly white, parts of the region, and/or the exclusion of transit-dependent workers from parts of the region where greater job growth is occurring;

c. Adverse health impacts, including but not limited to adverse air quality effects, with attendant increases in adverse health effects and risks, resulting from increased volumes of traffic and/or from inadequate provision of transit alternatives, and the extent to which any such effects are disproportionately borne by minority communities;

d. Community, neighborhood, economic development, employment, and local economic effects, especially on underemployed and unemployed, isolated and transit-dependent communities of color in Milwaukee;

e. Adverse effects, including but not limited to cumulative social and economic effects on communities of color, of expending limited public funds on this project in lieu of other transportation projects, including transit projects, that are needed in the same region, and the impacts of expending public funds to expand a highway project at the same time that funding is needed for the preservation – not just the expansion – of the transit system; and

f. Impacts on water volume and quality, and associated impacts such as flooding impacts on downstream communities, from the increased runoff and pollution likely to occur by the significantly expanded impermeable pavement surface alone and/or combined with proposed water-related projects in the region, as well as impacts upon local and regional sewer systems.

105. For the foregoing reasons, the FEIS fails to fulfill the purposes of NEPA, and Defendants' decision to approve and proceed with the project based on that flawed FEIS is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

THIRD CAUSE OF ACTION: VIOLATION OF NEPA (Failure to mitigate)

106. Plaintiffs reallege and incorporate paragraphs 1 through 98 above.

107. The FEIS and ROD prepared, reviewed and approved by WisDOT, Defendant Ross, and

28

the federal Defendants violates NEPA by failing to mitigate known adverse effects, including but not limited to the effect on transit-dependent communities – which are disproportionately composed of persons of color and persons with disabilities – of continuing to expand highway capacity while transit capacity declines, and of expanding highway capacity with its attendant adverse health and air quality effects closer to homes and neighborhoods disproportionately populated by persons of color.

108.    For the foregoing reasons, the FEIS fails to fulfill the purposes of NEPA and Defendants' decision to approve and proceed with the project based on that flawed FEIS is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Declare that the federal Defendants and Defendant Ross have failed to comply with NEPA by failing to prepare an adequate FEIS that considered all reasonable alternatives, addressed all required social, indirect and cumulative effects, and mitigated the harms identified;

b.  Declare that the Defendants' approval of, and decision to proceed with, the I-94 project, are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

c.  Issue an order vacating the FEIS, ROD, and Notice pertaining to the project and remanding the FEIS, ROD, and Notice to Defendants for the purposes of curing their violations of NEPA and the APA;

d.  Issue an order vacating any project agreement authorizing the use of federal funds for the project pursuant to 23 U.S.C. § 106(a);

e.  Grant preliminary and permanent injunctions barring Defendants from taking any action that in any manner supports or funds the design, property acquisition, construction, or development of the highway project until the violations of NEPA and the APA have been

cured;

f.  Award Plaintiffs reasonable attorney fees, costs, expenses, and disbursements associated with

    this litigation; and

g.  Grant such other or further relief as authorized by law and as this Court may deem just and

    proper.

Respectfully submitted this 1st day of March, 2017.

/s/Dennis M. Grzezinski
Dennis M. Grzezinski
Attorney for Plaintiffs NAACP - MILWAUKEE BRANCH,
SIERRA CLUB JOHN MUIR CHAPTER, and
MILWAUKEE INNER-CITY CONGREGATIONS
ALLIED FOR HOPE (MICAH)
Bar No.: 1016302
Law Office of Dennis M. Grzezinski
1845 N Farwell Ave Ste 202
Milwaukee, WI 53202-1715
Phone: (414) 530-9200
Fax: (414) 455-0744
dennisglaw@gmail.com

/s/ Karyn Rotker
Karyn Rotker
Attorney for Plaintiffs NAACP - MILWAUKEE BRANCH
and MILWAUKEE INNER-CITYCONGREGATIONS ALLIED FOR
HOPE (MICAH)
Bar No.: 1007719
American Civil Liberties Union of Wisconsin
207 E. Buffalo Street, Suite 325
Milwaukee, WI 53202-5774
Phone: (414) 272-4032
Fax: (414) 272-0182
krotker@aclu-wi.org